# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 27 2020, 7:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Nancy A. McCaslin
McCaslin & McCaslin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of the Termination of the Parent Child Relationship of T.L. (Minor Child);

L.L. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

February 27, 2020

Court of Appeals Case No.
19A-JT-1949

Appeal from the Elkhart Circuit Court

The Honorable Ashley Mills Colburn, Special Judge

Trial Court Cause No.
20C01-1903-JT-8

**Pyle, Judge.**

# Statement of the Case

L.L. ("Mother") appeals the termination of the parent-child relationship with her child, T.L. ("T.L.."), claiming that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that: (1) there is a reasonable probability that the conditions that resulted in T.L.'s removal or the reasons for placement outside Mother's home will not be remedied; (2) a continuation of the parent-child relationship poses a threat to the child's well-being; and (3) termination of the parent-child relationship is in the child's best interests. Concluding that there is sufficient evidence to support the trial court's decision to terminate the parent-child relationship, we affirm the trial court's judgment.[1]

We affirm.

# Issue

> Whether there is sufficient evidence to support the involuntary termination of Mother's parental rights.

# Facts

Mother is the parent of daughter, T.L., who was born in May 2018. At the time of T.L.'s birth, she tested positive for methamphetamine, and Mother tested positive for methamphetamine and amphetamine. DCS removed T.L. from

---

[1] T.L.'s father voluntarily relinquished his parental rights and is not a party to this appeal.

Mother's care and initially placed T.L. with her father. A few days later, when T.L.'s father tested positive for cocaine, DCS placed T.L. in foster care.

[4] DCS filed a petition alleging that T.L. was a child in need of services ("CHINS"). At the initial hearing, Mother admitted that T.L. was a CHINS. The trial court adjudicated T.L. to be a CHINS in June 2018. Following a dispositional hearing in July 2018, the trial court ordered Mother, in relevant part, to: (1) refrain from using illegal substances; (2) complete a substance abuse assessment and follow treatment recommendations; (3) submit to random drug screens; (4) attend scheduled supervised visitation with T.L.; (5) complete a parenting assessment and follow all recommendations; (6) obtain and maintain suitable, safe, and stable housing; (7) participate in home-based counseling and follow all recommendations; (8) maintain weekly contact with the DCS family case manager ("FCM"); (9) allow the FCM to make announced and unannounced visits to Mother's home; and (10) keep all appointments. The trial court also appointed a court appointed special advocate ("CASA").

[5] Thereafter, FCM Aaron Gray ("FCM Gray"), who worked with Mother throughout the CHINS and termination proceedings, referred Mother to various services. Mother initially engaged in some of the services but did not complete them, and she continued to test positive for methamphetamine.

[6] FCM Gray referred Mother to Lifeline for individual therapy, home-based services, and supervised visitation. Therapist, Amy Sturma (Therapist

Sturma") worked with Mother from July to December 2018 and had about thirty sessions with Mother to help her deal with past trauma and substance abuse issues. Mother informed Therapist Sturma that she had a history of substance abuse with marijuana, alcohol, opiates, and cocaine. Mother also told her therapist that "meth was her current drug choice[.]" (Tr. Vol. 2 at 106). Additionally, Barbara Henderson ("Henderson"), who was a home-based case manager through Lifeline, worked with Mother for three months by supervising Mother's visitation with T.L. and by trying to help Mother obtain housing.

[7] FCM Gray also referred Mother to Key Counseling for a substance abuse assessment, which Mother completed. Based on the scope and duration of Mother's previous drug use, Key Counseling's primary recommendation was that Mother needed to complete an inpatient treatment program. FCM Gray then helped Mother to enroll in an inpatient drug treatment program at the YWCA in September 2018. Mother, however, did not complete the program, leaving after two weeks. After she left the inpatient treatment program, Mother "didn't have any place to go" so she "stayed with friends" and "slept in [her] car for a while." (Tr. Vol. 2 at 149). Additionally, after Mother quit her inpatient treatment, her visits with T.L. became "intermittent[.]" (Tr. Vol. 2 at 99).

[8] Mother failed to remain drug free, and she continued to test positive for methamphetamine. In October 2018, given Mother's continued methamphetamine use, DCS requested that Mother be drug tested prior to supervised visits with T.L. The trial court granted the request and ordered that

Mother's visit would be cancelled if she were to have a positive screen. Thereafter, FCM Gray gave Mother an oral drug screen on the day of visits, but she was not able to have any visits because of positive test results. Mother's last visit with T.L. was in November 2018.

[9] Later, in December 2018, Mother participated in an outpatient treatment program at the Center for Positive Change. Mother was a "no show" on three of her appointments and did not complete the program. (Tr. Vol. 2 at 124). The outpatient program discharged Mother in December 2018 because the program recommended that Mother needed an inpatient drug treatment program.

[10] Within a week of her discharge, Mother was arrested on a drug possession charge in Michigan and spent time in jail.[2] Thereafter, Mother failed to contact her Lifeline service providers, causing them to cancel her services.

[11] Mother also failed to maintain contact with her FCM, including letting more than one month pass without communication. On March 8, 2019, while out on bond from her criminal case, Mother met with FCM Gray. He administered an oral drug screen, and Mother tested positive for methamphetamine. Mother told FCM Gray about her criminal charges and indicated that she would try to get into an inpatient program.

---

[2] The record on appeal does not indicate what drug Mother was charged with possessing.

[12] That same day, DCS filed a petition to terminate Mother's parental relationship with T.L.[3] The trial court held a termination hearing on June 17, 2019. At the time of the hearing, Mother had been sentenced in her Michigan criminal case and was attending a court-ordered inpatient drug treatment program in Saginaw, Michigan as part of probation. Mother appeared at the hearing via video.

[13] Therapist Sturma testified that she had tried to help Mother work on her past trauma and issues with methamphetamine use. The therapist testified that when Mother "was sober, she was great in working on the issues[,]" but that when "she was using[,] she would deny or put blame on other people or say that [she had a] contact buzz[.]" (Tr. Vol. 2 at 107). Therapist Sturma testified that she was able to recognize when Mother had been using methamphetamine because her physical appearance would show it. For example, Mother's body posture would be different, her face would become "broken out[,]" and her nose would be affected because Mother sometimes snorted the methamphetamine. (Tr. Vol. 2 at 108). Therapist Sturma also testified that Mother was "attentive" and "patient" during her supervised visits with T.L. but that Mother was required to have a drug screen for methamphetamine before having visitation because T.L. "was having reactions from [Mother] or her clothes[.]" (Tr. Vol. 2 at 108).

---

[3] After DCS filed the termination petition, Mother filed a motion for change of judge. The trial court granted Mother's motion, and a special judge was assigned to the case.

[14] Henderson, who was Mother's home-based case manager, testified that Mother had discussed her methamphetamine use history with her and had stated that "she just couldn't quite get off of it." (Tr. Vol. 2 at 100). When Henderson worked with Mother during the CHINS proceeding, Mother admitted to Henderson the times that she had used methamphetamine. Henderson testified that during those time, Mother had blamed her use on being "with the wrong people at the wrong time and the wrong place." (Tr. Vol. 2 at 100). Henderson also testified that Mother had quit her inpatient treatment at the YWCA against the advice of Lifeline and her therapist. Additionally, Henderson testified that while Mother initially had some visitation with T.L., her visitation had stopped in November 2018 when Mother had "disappeared" and had failed to contact her. (Tr. Vol. 2 at 101).

[15] FCM Gray testified that Mother had failed to comply with her court-ordered services by continuing to use methamphetamine, failing to complete a substance abuse treatment program, and failing to have weekly visitation with T.L. He testified that Mother's continued methamphetamine use had led DCS to conduct a drug screen of Mother on the day of any scheduled visit with T.L. and that Mother had not had visitation with T.L. for the seven months prior to the termination hearing. FCM Gray also testified that he had referred Mother to Oaklawn for a parenting assessment but that he did not have any records to show that she had completed the assessment.

[16] When asked whether Mother was likely to remedy the reasons requiring the removal of T.L. from Mother's care, FCM Gray responded that she was not.

He pointed out that, despite Mother's previous court order to complete drug treatment to address her methamphetamine use and her opportunities to complete inpatient and outpatient drug treatment programs, she had failed to complete the necessary treatment. FCM Gray testified that DCS was concerned about permanency for T.L. and that Mother had "not shown since the beginning of this case that she [wa]s willing to work as hard as she c[ould] to get [T.L.] in that permanency position." (Tr. Vol. 2 at 133). He recognized that, at the time of the hearing, Mother was in an inpatient drug treatment program in Michigan but pointed out that her attendance in that program only came about because of a court order in her criminal case. FCM Gray further testified that even if Mother were to successfully complete the Michigan drug treatment in a few months, she "would still have to maintain sobriety, . . . find housing, [and] . . . show some form of stability before DCS could possibly even talk about going back and trying to get [T.L.] in mom's care" and that there was no indication of "how long that would be[.]" (Tr. Vol. 2 at 132-33). He opined that termination of Mother's parental rights was in T.L.'s best interest. According to FCM Gray, T.L. had been "thriving" and had "a serious bond" with her foster parents in her pre-adoptive home. (Tr. Vol. 2 at 134, 135).

[17] CASA Payton Kammerdiener ("CASA Kammerdiener") testified that she had been T.L.'s CASA since the beginning of the CHINS case. CASA Kammerdiener recommended that Mother's parental rights be terminated and opined that termination was in T.L.'s best interests because Mother had not seen T.L. since November 2018 and was essentially a "stranger" to T.L., did

not have stable housing or employment, and had failed to maintain sobriety and because T.L. had "bonded extremely well" with her pre-adoptive foster parents. (Tr. Vol. 2 at 142, 143).

[18] Mother testified that she was currently on probation for two and one-half years from her Michigan criminal case and that she was enrolled in a Michigan inpatient treatment program as part of probation. She testified that she had been "clean" for three months while in the inpatient program and that she had an additional three months remaining to complete the program. (Tr. Vol. 2 at 151). Additionally, Mother testified that upon her release from the inpatient program, she was required to live in a sober living facility in Niles, Michigan until her probation could be transferred to Indiana. Mother challenged FCM Gray's testimony regarding her lack of visitation with T.L. and her failure to get a parenting assessment. Mother acknowledged that she had not seen T.L. since November 2018, but she stated that "[e]very time [she] got out of jail" she had asked FCM Gray if she could visit with T.L. (Tr. Vol. 2 at 153). In regard to her failure to complete a parenting assessment, Mother testified that she had not been aware that FCM Gray had referred her to Oaklawn for an assessment, and she stated that she had had a parenting assessment done by Lifeline.

[19] In July 2019, the trial court issued a detailed order terminating Mother's parental rights. Mother now appeals.

# Decision

Mother argues that there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re K.T.K.*, 989 N.E.2d 1225, 1230 (Ind. 2013). However, the law provides for termination of that right when parents are unwilling or unable to meet their parental responsibilities. *In re Bester*, 839 N.E.2d 143, 147 (Ind. 2005). The purpose of terminating parental rights is not to punish the parents but to protect their children. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied*.

When reviewing the termination of parental rights, we will not weigh the evidence or judge the credibility of the witnesses. *K.T.K.*, 989 N.E.2d at 1229. Rather, we consider only the evidence and reasonable inferences that support the judgment. *Id.* Where a trial court has entered findings of fact and conclusions thereon, we will not set aside the trial court's findings or judgment unless clearly erroneous. *Id.* (citing Ind. Trial Rule 52(A)). In determining whether the court's decision to terminate the parent-child relationship is clearly erroneous, we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment. *Id.* at 1229-30.

A petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1231.

[23] Here, Mother argues that there is insufficient evidence to support the termination of her parental rights. Specifically, she contends that the evidence is insufficient to show that there is a reasonable probability that: (1) the conditions that resulted in T.L.'s removal or the reasons for placement outside Mother's home will not be remedied; and (2) a continuation of the parent-child relationship poses a threat to T.L.'s well-being.

[24] At the outset, we note that INDIANA CODE § 31-35-2-4(b)(2)(B) is written in the disjunctive. Therefore, DCS is required to establish by clear and convincing evidence only one of the three requirements of subsection (B). *In re A.K.,* 924 N.E.2d 212, 220 (Ind. Ct. App. 2010). We therefore discuss only whether there is a reasonable probability that the conditions that resulted in the T.L.'s

removal or the reasons for her placement outside Mother's home will not be remedied.

[25] In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.* Requiring trial courts to give due regard to changed conditions does not preclude them from finding that a parent's past behavior is the best predictor of her future behavior. *E.M.*, 4 N.E.3d at 643.

[26] Here, T.L. was removed from Mother's care at T.L.'s birth because of Mother's drug use, namely methamphetamine. Indeed, Mother's methamphetamine use caused T.L. to test positive for methamphetamine. Our review of the evidence

reveals that, at the time of the termination hearing, Mother had not completed the court-ordered requirements in the CHINS dispositional order. Most notably, Mother continued to use methamphetamine during the CHINS proceeding, and she had not completed substance abuse treatment to address her methamphetamine use. In its termination order, the trial court recognized that Mother was attending an inpatient treatment program at the time of the termination hearing but noted that she was "required to attend the program as a condition of her criminal cases arising from illegal substance possession" and that her "failure to remain at her current treatment facility would lead to her arrest and a violation of her criminal probation." (App. Vol. 2 at 17). The trial court explained that "Mother's compliance just prior to the termination evidentiary hearing due to the threat of criminal sanctions [wa]s not persuasive" to the court. (App. Vol. 2 at 17). Rather, when concluding that there was "clear and convincing evidence that the reasons that led to the removal of [T.L.] from Mother's care w[ould] not be remedied[,]" the trial court referenced Mother's extensive substance abuse history, her failure to complete any substance abuse treatment despite the CHINS dispositional order, her failure to visit with T.L. since November 2018, her failure to comply with therapy, her failure to obtain stable housing, and her failure to obtain a parenting assessment.[4] (App. Vol. 2 at 17). This evidence supports the trial court's

---

[4] Mother contends that the trial court's conclusion that Mother had failed to obtain a parenting assessment was erroneous. Here, FCM Gray testified that he had referred Mother to Oaklawn for a parenting assessment. Mother testified that she was unaware of that referral and that Lifeline had done a parenting

conclusion that there was a reasonable probability that the conditions that resulted in T.L.'s removal would not be remedied. We find no error.

[27] Mother also argues that there is insufficient evidence that the termination was in T.L.'s best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest." *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (internal quotation marks and citation omitted). Further, the testimony of the service providers may support a finding that termination is in the child's best interests. *McBride v. Monroe Cty. Office of Family and Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003).

---

assessment. Two service providers from Lifeline testified, and they did not mention that they had done a parenting assessment. The trial court heard and weighed all this testimony, and we will not reweigh the trial court's credibility determination.

Here, our review of the evidence reveals that Mother has a history of substance abuse with marijuana, alcohol, opiates, cocaine, and methamphetamine. Mother's methamphetamine use caused T.L. to test positive for methamphetamine at her birth and precipitated the removal of T.L. from Mother's care. Mother's continued use of methamphetamine and failure to complete drug treatment to address her methamphetamine use during the CHINS proceedings caused the continued placement of T.L. outside Mother's home. At the time of the termination hearing, Mother was in a court-ordered residential drug treatment program as part of her probation from her Michigan drug possession case. Mother had historically been unable to provide stability and housing for T.L. and was unable to provide the same at the time of the termination hearing. In addition, FCM Gray and CASA Kammerdiener testified that termination was in T.L.'s best interests. The testimony of these service providers, as well as the other evidence previously discussed, supports the trial court's conclusion that termination was in T.L.'s best interests. Because there is sufficient evidence to support the termination of Mother's parental rights, we affirm the trial court's judgment.

Affirmed.

May, J., and Crone, J., concur.